[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Roberts,* Slip Opinion No. 2017-Ohio-2998.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2017-OHIO-2998

THE STATE OF OHIO, APPELLEE, *v*. ROBERTS, APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Roberts,* Slip Opinion No. 2017-Ohio-2998.]

*Criminal law—Aggravated murder—Death penalty—Sentence of death imposed after resentencing hearing—Death penalty affirmed.*

(No. 2014-0989—Submitted February 7, 2017—Decided May 30, 2017.)

APPEAL from the Court of Common Pleas of Trumbull County,

No. 2001 CR 793.

_____

O'DONNELL, J.

{¶ 1} This is the third time this case has been appealed to this court. After our review of the first appeal, we affirmed convictions for aggravated murder, aggravated burglary, and aggravated robbery but vacated the death sentence imposed on Donna Roberts and remanded the matter to the trial court for resentencing because the trial court had engaged in an ex parte communication with

the prosecuting attorney and allowed the prosecutor to participate in drafting the sentencing opinion. On remand, the trial court again imposed capital punishment.

{¶ 2} On the second appeal, we again vacated the death sentence and remanded the case, this time because we concluded that the trial court had failed to consider the defendant's allocution, since it was not referenced in the sentencing opinion.

{¶ 3} Pending our appeal, the trial judge retired and subsequently died, and therefore a different judge presided over the third resentencing and imposed a sentence of death.

{¶ 4} Roberts now appeals from that third sentence and presents four propositions of law. For the following reasons, we affirm the judgment of the trial court.

**Facts and Procedural History**

{¶ 5} Previous opinions in this case have set forth the facts of the killing in detail. *See State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168 ("*Roberts I*"), ¶ 1-86; *State v. Roberts*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100 ("*Roberts II*"), ¶ 1-7. For purposes of this opinion, we summarize the facts as follows.

{¶ 6} On December 12, 2001, Roberts reported the shooting death of Robert Fingerhut at their home in Howland Township, located in Trumbull County. After a week-long investigation, police arrested Roberts and Nathaniel Jackson,[1] a man she had been dating for two years and with whom she had been having an affair. Roberts was separately indicted and tried for the aggravated murder of Fingerhut. A jury found her guilty of aggravated murder with death

---

[1] Jackson was separately tried and convicted of murdering Fingerhut and sentenced to death. *See State v. Jackson*, 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362, and *State v. Jackson*, ___ Ohio St.3d ___, 2016-Ohio-5488, __ N.E.3d __.

penalty specifications and recommended a sentence of death, and at sentencing, the trial court imposed that sentence.

{¶ 7} The evidence presented at that trial reveals that although she and Fingerhut were divorced, they lived together and were regarded as husband and wife. Fingerhut owned two insurance policies on his life with a total benefit amount of $550,000, both of which named Roberts as the sole beneficiary.

{¶ 8} Roberts began an affair with Nathaniel Jackson, who later went to prison on convictions unrelated to this case. During his incarceration, he and Roberts exchanged numerous letters, which police recovered from her house and the trunk of her car. Prison authorities also recorded 18 of their telephone conversations.

{¶ 9} The letters and conversations included extensive discussion of how they intended to deal with Fingerhut upon Jackson's release from prison. Jackson repeatedly avowed that when he obtained his release, he would kill Fingerhut. In one letter, Roberts complained about Fingerhut's control of her finances and urged Jackson to "[d]o whatever you want to him ASAP." At Jackson's request, Roberts bought a ski mask and a pair of gloves for Jackson to use during the murder.

{¶ 10} On December 9, 2001, upon Jackson's release, Roberts picked him up at the prison and spent that night and much of the next two days with him.

{¶ 11} On December 11, Fingerhut left work around 9:00 p.m. A witness saw Roberts in her car around 9:30 p.m. She had given her cell phone to Jackson, and telephone records show six calls from her cell phone to the phone in her car between 9:45 and 10:00 p.m., and two more at 11:01 and 11:44 p.m. One call had been placed from her car phone to her cell phone at 10:03 p.m.

{¶ 12} That night, Roberts went to the Days Inn in Boardman, Ohio, and reserved a room for a week. Police later found Jackson's fingerprints in that room.

{¶ 13} After midnight on December 12, Roberts called 9-1-1 from her residence and told the operator that something was wrong with her husband. When police arrived, they found Fingerhut's body on the kitchen floor. An autopsy revealed that he had been shot and died from multiple gunshot wounds.

{¶ 14} At 3:38 a.m., while officers were processing the crime scene, the telephone rang. Howland Township Detective Sergeant Paul Monroe answered, but after a pause, the caller hung up without speaking. At trial, the state established that this call originated from Roberts's cell phone. Roberts later admitted to detectives that "Nate [Jackson] must have had the phone. He's always borrowing it."

{¶ 15} On the afternoon of December 12, Monroe and Detective Sergeant Frank Dillon interviewed Roberts at Howland Township police headquarters. Roberts described her relationship with Fingerhut as "loving," but claimed that sexually, Fingerhut "did his thing [and] she did hers." She also told the detectives that she had been in a sexual relationship for six months with someone named Carlos. When Monroe asked Roberts if she had relationships with anyone else, Roberts replied, "No, there's nobody else. I told you everybody." Monroe then asked about Jackson, and Roberts claimed she had forgotten about him.

{¶ 16} She then admitted that she had been dating Jackson for two years, that he had phoned her from prison, and that they had corresponded. She also stated that she had last seen Jackson on December 9, when she picked him up at the prison, but she added that she had last spoken to him over the telephone on the morning of December 11.

*Indictment, Trial, and Verdict*

{¶ 17} A grand jury indicted Roberts on two counts of aggravated murder, R.C. 2903.01(A) (purposely causing death with prior calculation and design) and (B) (felony murder). Both counts contained two death specifications pursuant to R.C. 2929.04(A)(7): one charging aggravated murder during the commission

of aggravated burglary and one charging aggravated murder during the commission of aggravated robbery, with each alleging prior calculation and design and/or that Roberts was the principal offender. The indictment also charged her with aggravated burglary, R.C. 2911.11, with a firearm specification, R.C. 2941.145, and aggravated robbery, R.C. 2913.01, with a firearm specification. The jury found Roberts guilty of all counts and specifications. At sentencing, the state elected to proceed on Count One (prior calculation and design), and the trial court dismissed Count Two (felony murder) and its specifications.

*Sentencing*

**{¶ 18}** Before the mitigation hearing, Roberts informed her counsel that she did not wish to present any mitigating evidence except an unsworn statement. As a result, the court conducted an *Ashworth* hearing and found her competent to make that decision. *See generally State v. Ashworth*, 85 Ohio St.3d 56, 706 N.E.2d 1231 (1999), paragraph one of the syllabus. At the mitigation hearing, Roberts exercised her right pursuant to R.C. 2929.03(D)(1) to make an unsworn statement to the jury and declined to present any other evidence. The jury recommended a death sentence, and the trial court sentenced Roberts to death.

*First Appeal*

**{¶ 19}** On direct appeal, we affirmed her convictions for aggravated murder, aggravated burglary, and aggravated robbery, but we vacated the death sentence and remanded the case to the trial court because the judge had improperly allowed the prosecutor to participate in drafting the sentencing opinion, and in doing so had engaged in ex parte communication with the prosecutor. *Roberts I*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1186, ¶ 153-164. We ordered the trial judge on remand to "afford Roberts her right to allocute" provided by Crim.R. 32(A)(1), to "personally review and evaluate the evidence, weigh the aggravating circumstances against any relevant mitigating evidence, and

determine anew the appropriateness of the death penalty," and to prepare "an entirely new penalty opinion." *Roberts I* at ¶ 167.

{¶ 20} On remand, the trial court afforded Roberts her right to allocution, and one week later, after asking her if she had anything further to say and hearing argument from defense counsel, the court sentenced her to death and filed its sentencing opinion pursuant to R.C. 2929.03(F).

*Second Appeal*

{¶ 21} Roberts appealed as of right from the second judgment imposing the death sentence. On that appeal, we sustained the second proposition of law, concluding that the court had failed to consider her allocution in determining her sentence during the proceeding on remand. *Roberts II*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, ¶ 51-76. For the second time, we vacated the death sentence and remanded the case for resentencing. We directed the trial court as follows:

> On remand, the trial court is to review the entire record, including Roberts's allocution of October 22, 2007. The trial court shall consider the entire record—again, including the allocution—in determining whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. The trial court shall then write and file a sentencing opinion pursuant to R.C. 2929.03(F) reflecting that it has complied with these instructions.

> In accordance with our holding as to Roberts's first proposition of law, Roberts is not entitled to present any further evidence on remand. Moreover, because Roberts has been given her opportunity to make allocution pursuant to Crim.R. 32, she is not entitled to make another one.

> Finally, while the trial court must consider Roberts's allocution, nothing in today's opinion should be interpreted as a determination that the matters discussed in her allocution are true or that the trial court must afford them any particular weight. It is for the trial court to determine in the first instance what mitigating factors, if any, are present in the case, and what weight, if any, they should be given.

*Id.* at ¶ 73-75. We further specified that "the trial court must make an independent determination of whether a death sentence is appropriate and may not give deference to the sentences previously entered." *Id*. at ¶ 96.

{¶ 22} The original trial judge in this case retired and subsequently died during the pendency of the second appeal. *Id.* at ¶ 78. On remand, Judge Ronald Rice presided over the resentencing.

{¶ 23} Roberts filed a motion in the trial court to preclude a death sentence, or in the alternative, to order a full penalty-phase hearing. In this motion, Roberts argued that because Judge Rice had neither presided over the trial nor personally heard her allocution, he could not properly weigh the aggravating circumstances against the mitigating factors and sentence her to death.

{¶ 24} On April 30, 2014, Judge Rice heard arguments on the defense motion. He denied the motion on the grounds that (1) our instructions in *Roberts II* regarding the proceedings on remand precluded granting the motion and (2) this court in *Roberts II* had "already considered and rejected [Roberts's] arguments" with regard to the presentation of additional evidence.

{¶ 25} Judge Rice then imposed sentence. He stated that he had carefully reviewed the entire record, including the guilt and penalty phases of Roberts's trial, the record of proceedings on remand, including Roberts's allocution, and all exhibits. He also announced that he had "given no deference to the prior decisions

of" the original trial judge. Finally, he announced his finding that "the aggravating circumstances outweigh the mitigating factors by proof beyond a reasonable doubt" and that death was an appropriate sentence. He incorporated those findings into a sentencing opinion that was later reissued nunc pro tunc to correct "editing inconsistencies" in the original version. At the hearing, he also reimposed sentences on the noncapital counts and notified Roberts about postrelease control.

{¶ 26} On this appeal, Roberts presents four propositions of law. Finding merit in none, we overrule them all and affirm the judgment of the trial court.

### Substitute Judge

{¶ 27} Roberts's first and fourth propositions of law are related and will be discussed together.

{¶ 28} Roberts contends that when a capital case is remanded for resentencing before a judge other than the one who originally imposed sentence, capital punishment is precluded because no statutory provision specifically permits such a procedure. She further argues that the Eighth Amendment precludes a death sentence in these circumstances unless the substitute judge at least permits the defendant to make a new allocution. In her fourth proposition, Roberts contends that, if a death sentence is permissible in such a situation, R.C. 2929.06(B) requires that the substitute judge empanel a new jury and conduct a new mitigation hearing before imposing a death sentence.

{¶ 29} We begin by examining the statutory arguments presented.

### *Statutory Arguments*

{¶ 30} In the first proposition of law, Roberts argues that "[t]he sentencing option of death should have been precluded" on remand because "Ohio's statutory scheme does not provide a procedure for a * * * rewriting of the R.C. 2929.03(F) opinion where the original judge is no longer available to write the opinion."

{¶ 31} Roberts bases this argument on *State v. Penix*, 32 Ohio St.3d 369, 513 N.E.2d 744 (1987). In *Penix*, a capital defendant appealed his conviction of

aggravated murder and sentence of death. The court of appeals affirmed the conviction, but vacated the death sentence due to erroneous penalty-phase jury instructions and remanded the case for resentencing. We affirmed the judgment of the court of appeals. *Id*. at 370-372.

{¶ 32} We then considered "the procedure to be employed, and the penalties which may be imposed, upon resentencing." *Id*. at 372. We held that a death sentence could not be imposed on resentencing, because R.C. 2929.03(C)(2)(b) specifically provided that "the *trial* jury and the *trial* judge shall sentence a defendant who has been tried by jury and convicted of aggravated murder and one or more [death] specifications." (Emphasis sic.) *Id*. Further, we noted that R.C. 2929.03(D)(2) makes repeated reference to "the trial jury" weighing mitigating factors against aggravating circumstances and making a sentencing recommendation. *Id*. at 372-373. "Thus, the decisions leading to a death sentence must be made by the same jury that convicted the offender in the guilt phase. There are simply no statutory provisions for another jury to make these crucial determinations." *Id*. at 373. Absent statutory authority, we declined to "create such a procedure out of whole cloth." *Id*.

{¶ 33} In 1996, the General Assembly enacted legislation abrogating the specific holding of *Penix*. *See State v. White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, ¶ 6, 21, and paragraph one of the syllabus (discussing effect of 1996 amendments to R.C. 2929.06(B)).

{¶ 34} Roberts argues by analogy that because no statutory provision specifically authorizes a judge who has not previously presided over the case to sentence a capital defendant on remand, such a procedure is as impermissible as the retrial of the defendant's sentencing phase before a new jury was in *Penix*.

{¶ 35} The analogy fails. In *Penix*, we relied heavily on the language of R.C. 2929.03(C)(2)(b) and 2929.03(D)(2), which specifically entrust the trial jury with making the necessary findings in capital cases. At that time, and until the

enactment of R.C. 2929.06(B), no provision of law authorized any other jury to perform that task.

{¶ 36} It is true that R.C. 2929.03(C)(2)(b)(ii) similarly provides that a capital defendant shall be sentenced "[b]y the trial jury and *the trial judge*, if the offender was tried by jury." (Emphasis added.) However, R.C. 2929.06(B) now authorizes resentencing on remand in capital cases. And R.C. 2929.06(B) does not require that the "trial judge" preside over a capital defendant's resentencing. Rather, it provides that if a death sentence is set aside due to sentencing error, "the trial *court* that sentenced the offender shall conduct a new hearing to resentence the offender." (Emphasis added.)

{¶ 37} The General Assembly's use of the term "trial *court*" in R.C. 2929.06(B) suggests that it did not intend to require that the "trial *judge,*" i.e., the individual who presided over the capital defendant's trial, necessarily must also preside over that defendant's resentencing. *See Metro. Secs. Co. v. Warren State Bank*, 117 Ohio St. 69, 76, 158 N.E. 81 (1927) (when General Assembly uses certain language in one instance and wholly different language in another, it will "be presumed that different results were intended"); *Indus. Comm. v. Snyder*, 113 Ohio St. 405, 415, 149 N.E. 397 (1925); *State v. Herbert*, 49 Ohio St.2d 88, 113, 358 N.E.2d 1090 (1976) (Corrigan, J., dissenting) ("the use of different language gives rise to a presumption that different meanings were intended").

{¶ 38} In addition, the Rules of Criminal Procedure specifically authorize a trial judge who has not presided over a trial to sentence a defendant. Crim.R. 25(B) provides:

> If for any reason the judge before whom the defendant has been tried is unable to perform the duties of the court *after a verdict or finding of guilt*, another judge designated by the administrative judge, or, in the case of a single-judge division, by the Chief Justice of the

Supreme Court of Ohio, may perform such duties. If such other judge is satisfied that he cannot perform those duties because he did not preside at the trial, he may in his discretion grant a new trial.

(Emphasis added.)

**{¶ 39}** Thus, it is "entirely proper" for a substitute judge to sentence a defendant after the retirement or death of the judge who presided over the defendant's trial. *State v. Green*, 122 Ohio App.3d 566, 571, 702 N.E.2d 462 (12th Dist.1997). *See also State v. Fitzpatrick*, 1st Dist. Hamilton Nos. C-930413, C-930439, B-927123, and B-928955, 1994 WL 164189 (May 4, 1994) (Crim.R. 25(B) authorized substitution of judge on sentencing when substitute judge stated on record that trial judge "would not be available for several months" and substitute "had familiarized himself with the file").

**{¶ 40}** Crim.R. 25(B) applies to sentencing in general. We can find nothing in its language that precludes its operation in a capital case. Moreover, the rule applies by its terms to the situation in this case. Because the original trial judge retired and subsequently died before we remanded the case in *Roberts II*,[2] he was "unable to perform the duties of the court after a verdict or finding of guilt." Crim.R. 25(B).

**{¶ 41}** Roberts contends that we should take "guidance" from R.C. 2901.04(A), the rule of lenity. But the rule of lenity is not relevant here. R.C. 2901.04(A) provides that "sections of the Revised Code *defining offenses or penalties* shall be strictly construed against the state, and liberally construed in favor of the accused." (Emphasis added.) No statutory definition of "offenses or

---

[2] Roberts incorrectly states that when we ordered resentencing in *Roberts II*, we assumed the trial judge would conduct the resentencing. In fact, we understood that resentencing "necessarily [would] be conducted by a different judge." *Roberts II*, 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, ¶ 78.

penalties" is at issue here. This case involves the *procedure* for imposing a death sentence on remand. "[S]ections of the Revised Code providing for criminal procedure shall be construed so as to effect the fair, impartial, speedy, and sure administration of justice." R.C. 2901.04(B).

**{¶ 42}** For the foregoing reasons, we reject Roberts's claim that Ohio law does not authorize the resentencing of a capital defendant on remand by a judge other than the judge who presided over the trial.

**{¶ 43}** The fourth proposition of law urges that if we reject the first proposition of law, R.C. 2929.06(B) should apply to the resentencing and require a de novo penalty-phase hearing before a new jury.

**{¶ 44}** Roberts cites the following language of the statute:

> *Whenever* any court of this state or any federal court sets aside, nullifies, or vacates a sentence of death imposed upon an offender because of error that occurred in the sentencing phase of the trial and if division (A) of this section does not apply, the trial court that sentenced the offender *shall conduct a new hearing to resentence the offender. If the offender was tried by a jury, the trial court shall impanel a new jury* for the hearing.

(Emphasis added.) R.C 2929.06(B).

**{¶ 45}** However, the error that invalidated the death sentence imposed in this case—i.e., the trial court's failure to consider Roberts's allocution—took place *after* the trial court discharged the jury. And the general rule is that "[u]pon remand from an appellate court, the lower court is required to proceed from the point at which the error occurred." *State ex rel. Stevenson v. Murray*, 69 Ohio St.2d 112, 113, 431 N.E.2d 324 (1982); *see also State v. Chinn*, 85 Ohio St.3d 548, 565, 709 N.E.2d 1166 (1999). We find no indication in R.C. 2929.06(B) that the General

Assembly intended to abrogate that rule in capital cases. Thus, on the second remand, the trial court was required to proceed from the point of error, not from an earlier point in the sentencing proceedings.

{¶ 46} In *Roberts I*, we left the jury's penalty-phase recommendation undisturbed because no reversible error infected it. Because a legally valid penalty-phase jury verdict has already been rendered in this case, there is no reason to empanel a jury and retry the evidentiary portion of either the guilt or penalty phases of the proceeding.

{¶ 47} "It is a cardinal rule of statutory construction that a statute should not be interpreted to yield an absurd result." *Mishr v. Poland Bd. of Zoning Appeals*, 76 Ohio St.3d 238, 240, 667 N.E.2d 365 (1996). It would be absurd to read R.C. 2929.06(B) as requiring that a new hearing be held and a new jury be empaneled for resentencing in a case where the original jury's recommendation of death is untainted by error. Such an interpretation would be especially illogical in light of recent precedent interpreting R.C. 2929.06(B). As we have observed, "[i]t is evident that the intent of R.C. 2929.06(B) was to abrogate *Penix* and to make all capital offenders whose death sentences are set aside eligible for a death sentence on resentencing." *White*, 132 Ohio St.3d 344, 2012-Ohio-2583, 972 N.E.2d 534, at ¶ 21.

{¶ 48} Therefore, when a capital case is remanded to a trial court for resentencing pursuant to R.C. 2929.06(B), the trial court need not empanel a new jury if the case has been remanded for an error, such as a postverdict sentencing error on the part of the trial judge, that does not invalidate the jury's verdict recommending a death sentence.

{¶ 49} Here, the matter involves a postverdict sentencing error on the part of a trial judge that can be corrected on remand without the involvement of the jury. Thus, we overrule the fourth proposition of law.

*Constitutional Argument*

{¶ 50} Stressing the importance of the trial judge's ability to see and hear the defendant's allocution and the evidence adduced in the penalty phase, Roberts contends that it is impossible for a judge to properly consider or weigh the mitigating factors present in the case by reviewing a cold record, and she urges that such a procedure infringes on a capital defendant's ability to have mitigation properly presented and accurately assessed. She further contends that the Eighth Amendment requires that the sentencer in a capital case "must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Penry v. Lynaugh*, 492 U.S. 302, 327-328, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), *overruled on other grounds*, *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

{¶ 51} Roberts cites *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion), which states that the sentencer in a capital case may "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that defendant proffers as a basis for a sentence less than death." (Emphasis sic.) *See also Eddings v. Oklahoma*, 455 U.S. 104, 113-114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (sentencer may not "refuse to consider, *as a matter of law*, any relevant mitigating evidence" [emphasis sic]); *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (testimony about defendant's good behavior in jail pending trial was relevant and therefore could not be excluded); *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987) (death sentence invalid when instructions precluded jury's consideration of mitigating circumstances not enumerated in statute); *Penry* at 319-328 (instructions preventing jury from giving effect to evidence of intellectual disability were inconsistent with *Lockett* and *Eddings*).

**{¶ 52}** However, none of these cases address the question presented in this case. In *Saffle v. Parks*, 494 U.S. 484, 490, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), the Supreme Court explained, "There is no dispute as to the precise holding in [*Lockett* and *Eddings*]: that the State cannot bar relevant mitigating evidence from being presented and considered during the penalty phase of a capital trial." *See also Buchanan v. Angelone*, 522 U.S. 269, 276, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998) ("Our consistent concern has been that restrictions on the jury's sentencing determination not preclude the jury from being able to give effect to mitigating evidence"). We recognized as much in *Roberts II*: "Each case in the *Lockett-Eddings-Skipper-Hitchcock* tetralogy involved the trial court's exclusion of, or refusal to consider, evidence in the original sentencing proceeding." 137 Ohio St.3d 230, 2013-Ohio-4580, 998 N.E.2d 1100, at ¶ 34.

**{¶ 53}** In this case, the issue is not what information is constitutionally relevant, but rather, it is whether a sentencing judge in a capital case may consider mitigation presented by the defendant without having *personally* observed its presentation in court.

**{¶ 54}** Here, the assignment of Judge Rice to conduct the third sentencing hearing based on review of the record and without hearing additional mitigating evidence did not "bar relevant mitigating evidence from being presented and considered during the penalty phase." *Saffle* at 490. Roberts had an opportunity to present mitigating evidence during the penalty phase of her trial, but she elected not to do so. Previously, she had made an unsworn statement and had an opportunity for allocution. Judge Rice reviewed and considered her unsworn statement, her allocution, and the evidence in the trial record before imposing sentence for the third time.

**{¶ 55}** *Saffle* rejected a capital defendant's attempt to derive from *Lockett* and *Eddings* "a rule relating, not to *what* mitigating evidence the jury must be permitted to consider in making its sentencing decision, but to *how* it must consider

the mitigating evidence." (Emphasis sic.) *Saffle*, 494 U.S. at 490, 110 S.Ct. 1257, 108 L.Ed.2d 415. Likewise, Roberts seeks to derive from *Lockett* and *Penry* a rule "relating, not to what mitigating evidence the [judge] must be permitted to consider," but to *how* the judge must obtain it (i.e., by live presentation as opposed to reviewing a record). Neither *Lockett* nor its progeny state or imply any such rule.

{¶ 56} Indeed, the California Supreme Court has rejected similar constitutional claims in two capital cases: *People v. Espinoza*, 3 Cal.4th 806, 12 Cal.Rptr.2d 682, 838 P.2d 204 (1992), and *People v. Lewis*, 33 Cal.4th 214, 14 Cal.Rptr.3d 566, 91 P.3d 928 (2004).

{¶ 57} In *Espinoza*, the trial judge became ill during the guilt phase of the trial and another judge reviewed the transcript and completed the trial. *Espinoza* at 827-828. *Lewis*, like this case, involved a capital case that had been remanded for resentencing due to postverdict error. *Lewis* at 218. The original trial judge withdrew, and the resentencing was assigned to a different judge, who denied a defense request to present the guilt- and penalty-phase evidence by live testimony and proceeded to sentence the defendant on the basis of the record. *Id.* at 224.

{¶ 58} In both cases, the defendants argued that because the substitute judge had not personally heard all the evidence, he could not properly impose a death sentence. And in both cases, the court rejected that argument. *Espinoza* at 830; *Lewis* at 226. The court in *Lewis* explained: "[W]hen the original trial judge is unavailable, necessity requires the replacement judge to evaluate the credibility of the witnesses as best he or she can from the written record. We find no constitutional obligation to provide more." *Id*.

{¶ 59} In the instant case, the retirement and death of the original trial judge and the substitution of Judge Rice did not deny Roberts the ability to present mitigating evidence or to have it considered by the sentencer. Her claim to the contrary is not supported by the *Lockett* line of cases she cites, and both *Lewis* and *Espinoza*, the only cases we have found that address this issue in the capital-

sentencing context, reject the notion that a capital defendant may be sentenced to death only by a judge who has personally presided over one or both phases of the trial. We therefore reject this Eighth Amendment argument.

{¶ 60} Accordingly, we overrule the first and fourth propositions of law.

## The Sentencing Opinion

### *Weighing the Mitigating Factors*

{¶ 61} The second proposition of law concerns the weight the trial court afforded the mitigating factors discussed in the allocution. Roberts concedes that "the trial court did identify numerous factors in mitigation" but contends that they received little weight because they were not properly considered by the trial court.

{¶ 62} Roberts further argues that the trial court erred in stating that the mitigating factors found in her allocution "do not even draw the Court's attention away from the aggravating circumstances," and she suggests that the use of this phrase reflects improper weighing, because a defendant is not required to offer mitigation that " 'draw[s] the Court's attention' from the [aggravating circumstances]."

{¶ 63} The trial court's use of this phrase does not constitute error. The opinion of the trial court reflects that the proffered mitigating factors were weak and lacked significance in comparison to the aggravating circumstances. R.C. 2929.03(D)(3) *requires* the trial court to determine whether the aggravating circumstances outweigh the mitigating factors, and the language to which Roberts objects does no more than express the trial court's conclusion in that regard.

{¶ 64} Roberts contends that the trial court engaged in improper speculation that she made up allegations of domestic violence to induce Jackson to help her. The sentencing opinion notes that Roberts made allegations in her letters to Jackson "regarding the physical abuse she suffered at the hand of Mr. Fingerhut." The opinion later notes that "absolutely no evidence before the Court * * * support[ed] the veracity of the physical abuse allegations." Roberts claims that the trial court's

discussion improperly "reduc[ed] the weight domestic violence should have been provided."

{¶ 65} Roberts's argument is premised on two misunderstandings of the record. First, contrary to Roberts's claim, the record *does* contain evidence that Roberts falsely told Jackson that Fingerhut abused her. She implied as much in her unsworn statement when she said: "I said a lot of things that weren't true to Nathaniel. My husband never touched me. He never laid a hand on me." And several of her letters describe physical altercations.

{¶ 66} Second, as the trial court found, the record contains no evidence to corroborate the claim of domestic violence found in Roberts's letters. Roberts herself repudiated that claim in her unsworn statement. Thus, the trial court did not improperly "reduce the weight" of domestic violence as a mitigating factor; absent any evidence of domestic violence, the court properly determined that domestic violence should receive no weight.

{¶ 67} Next, she contends that the trial court gave improper reasons for minimizing the weight to be given to her statements in allocution that she had been sexually abused as a child and that her auto accidents caused physical and mental trauma and related depression. With respect to childhood sexual abuse, the trial court noted the lack of any connection between the abuse and the murder of Fingerhut. Roberts contends that "[t]here is no requirement" that a defendant establish a "direct connection" between childhood sexual abuse and a capital crime.

{¶ 68} It is true that a sentencer may not refuse to *consider* mitigating evidence on the ground that no connection exists between that evidence and the murder for which the defendant is being sentenced. *See Smith v. Texas*, 543 U.S. 37, 45, 48, 125 S.Ct. 400, 160 L.Ed.2d 303 (2004) (evidence of defendant's troubled childhood and low IQ was constitutionally relevant despite lack of nexus with murder; hence, instruction preventing jury from giving effect to that evidence violated Eighth Amendment).

**{¶ 69}** But the trial court in this case did not refuse to consider Roberts's claim of childhood sexual abuse. Nothing in the sentencing opinion suggests that the court would exclude or ignore the alleged abuse simply because no nexus could be found between it and the murder.

**{¶ 70}** Instead, the trial court merely recognized that a childhood trauma that *did* contribute in some way to a defendant's crime would necessarily have greater impact on the defendant's moral blameworthiness—and therefore would deserve greater weight in mitigation—than a childhood trauma having no connection to the crime. Whether mitigating factors help to explain the murder is obviously relevant to the weight of those factors and may be considered by the sentencer in assigning weight to them. *See State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 402 (holding defendant's childhood abuse "entitled to weight" but noting that "there was no evidence of any significant connection between [the defendant's] childhood abuse and [the victim's] murder").

**{¶ 71}** Next, Roberts contends that the sentencing opinion improperly "minimized or de-valued" the mitigating weight of her auto accidents (which took place in 1963, 1983, and 1999) and her resulting physical injuries, depression, and suicide attempt. The opinion states that "these incidents are isolated and occurred in a time frame so far removed from the murder of Mr. Fingerhut that their relevance for mitigation is significantly decreased."

**{¶ 72}** Without citation to authority, she asserts: "There is no basis in law for discounting mitigation because the court finds the lack of proximity in time to the offense." In other words, she argues that a sentencer may not attach less significance to a mitigating factor on the ground that the factor came into existence long before the murder.

**{¶ 73}** Yet in assigning weight to a defendant's traumatic childhood in *State v. Campbell*, 95 Ohio St.3d 48, 765 N.E.2d 334 (2002), we took into account that the defendant

was nearly forty-nine years old when he committed the murder that is the subject of this case. He had reached "an age when * * * maturity could have intervened" and "had clearly made life choices as an adult before committing [this] murder." * * * At forty-nine, [the defendant] *had considerable time to distance himself from his childhood* and allow other factors to assert themselves in his personality and his behavior.

(Emphasis and second brackets added.) *Id.* at 53, quoting *State v. Murphy*, 65 Ohio St.3d 554, 588, 605 N.E.2d 884 (1992) (Moyer, C.J., dissenting).

{¶ 74} The trial court's reasoning here is similar to ours in *Campbell*—the passage of many years between an alleged traumatic event and an aggravated murder can diminish the mitigating weight attributed to the traumatic event—and we adhere to the analysis in *Campbell* in this case.

{¶ 75} Finally, Roberts complains that the sentencing opinion states that her charitable works and "generosity," as reported by her on allocution, and her claim that she suffered from "mental trauma" seem inconsistent with her insistent references to her financial success during the same allocution. Roberts argues that the trial court improperly used "evidence of mitigation * * * to cancel out the weight to be afforded clearly established mitigation." She cites no authority for this argument, nor does she explain why it is improper for the sentencing judge to point out what appear to be contradictions in the defendant's presentation.

{¶ 76} Thus, the second proposition of law is not well taken.

*Consideration of the Nature and Circumstances of the Offense*

{¶ 77} The third proposition of law contends that the trial court improperly used the nature and circumstances of the offense as an aggravating circumstance based on the following language from the sentencing opinion:

20

Roberts planned and plotted for the murder of Fingerhut over a period of at least three months. She conspired with Jackson, her imprisoned lover, to murder Fingerhut for his life insurance proceeds. The murder plan was well documented through telephone calls recorded from Jackson's residence[:] the Lorain Correctional Institut[ion]. In addition, detailed letters were exchanged between the loving couple outlining their plans. These plans included the acquisition of supplies, the procurement of a hotel room, and the promise of a new vehicle for Jackson—all provided by Roberts. Ultimately, Roberts provided access to the residence in order for Jackson to carry out the murder as planned.

Despite these intricate details, Roberts "forgot" to include Jackson as one of her named lovers to the police during interviews. In addition, Roberts attempted to thwart the investigation into the Fingerhut murder by implicating other individuals[,] not Jackson. In addition, Roberts's feigned emotional outbursts over Fingerhut's death do not correlate to the insidious behavior relative to the same.

Therefore, the court has granted little to no weight to any of the mitigating factors outlined by Roberts in her unsworn statement or her allocution.

{¶ 78} Roberts argues that her planning and preparation, her pecuniary motive, and her attempts to deceive the police and impede their investigation are part of the nature and circumstances of the offense. Pursuant to R.C. 2929.04(B), the nature and circumstances of the offense are mitigating factors and may not be weighed on the side of aggravation in determining whether aggravation outweighs mitigation. *See generally State v. Stumpf*, 32 Ohio St.3d 95, 99, 512 N.E.2d 598

(1987); *State v. Wogenstahl*, 75 Ohio St.3d 344, 354-355, 662 N.E.2d 311 (1996); *State v. Davis*, 76 Ohio St.3d 107, 120, 666 N.E.2d 1099 (1996). Since the trial court used these facts to determine that Roberts's proffered mitigating factors were to be "granted little or no weight," she contends that the trial court in effect weighed them *against* mitigation.

**{¶ 79}** This contention lacks merit. "When a court correctly identifies the aggravating circumstances in its sentencing opinion, we will presume that the court relied only on those circumstances and not on nonstatutory aggravating circumstances." *State v. Clemons*, 82 Ohio St.3d 438, 447, 696 N.E.2d 1009 (1998). That presumption applies here because the sentencing opinion correctly identifies the aggravating circumstances in this case, and Roberts failed to overcome the presumption.

**{¶ 80}** R.C. 2929.03(D)(1) requires the court to consider "the nature and circumstances of the aggravating circumstances the offender was found guilty of committing." Aggravating circumstances here consist of felony-murder specifications pursuant to R.C. 2929.04(A)(7), which include findings that "the offender * * * if not the principal offender, committed the offense with prior calculation and design." Thus, the detailed planning of this killing, which was referenced in the sentencing opinion, is evidence that supports the finding of prior calculation and design and therefore was properly considered as part of the statutory aggravating circumstances in this case.

**{¶ 81}** Moreover, it is settled law that the nature and circumstances of the offense may also be used to explain *why* the aggravating circumstances outweigh the mitigating factors. *See*, *e.g.*, *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 183, citing *State v. Sheppard*, 84 Ohio St.3d 230, 238, 703 N.E.2d 286 (1998). In this case, the facts cited in the sentencing opinion are relevant to the mitigation offered because they refute the defendant's factual assertions.

**{¶ 82}** In her unsworn statement and in her allocution, Roberts asserted that she and Fingerhut had a good relationship and loved each other deeply. The trial court reasonably viewed these statements to be inconsistent with the relationship she had maintained with Jackson, her conspiracy with him to murder Fingerhut, her pecuniary motive for that murder, and her feigned emotional outbursts during police interviews. The sentencing opinion properly referred to these facts to refute her claims.

**{¶ 83}** The sentencing opinion does not treat the nature and circumstances of the offense as nonstatutory aggravating circumstances. Instead, the opinion correctly identifies the aggravating circumstances found by the jury's verdict and then discusses the facts of the case as they relate to those aggravating circumstances and to the claimed mitigating factors. Roberts's third proposition of law is therefore overruled.

### Sixth Amendment Claim

**{¶ 84}** During oral argument, Roberts argued that the sentencing procedure employed on remand violated *Hurst v. Florida*, ___ U.S. __, 136 S.Ct. 616, 193 L.Ed.2d 504 (2016), which held that Florida's capital-sentencing scheme violated the Sixth Amendment right to a jury trial because it "[did] not require the jury to make the critical findings necessary to impose the death penalty" but instead allowed the trial judge to increase the defendant's "authorized punishment based on her own factfinding." *Id*. at ___, 136 S.Ct. at 622. We recognize that the United States Supreme Court decided *Hurst* after the submission of briefs in this case, but Roberts could have made essentially the same Sixth Amendment argument by relying on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**{¶ 85}** We therefore decline to address this claim because it has not been presented in a proposition of law or briefed by the parties, having been raised for the first time during oral argument. When an appellant's initial brief fails to

mention an argument as a basis for reversing the judgment under review, we need not address that argument in deciding the appeal. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 17-19; *State v. Carter*, 27 Ohio St.2d 135, 139, 272 N.E.2d 119 (1971) (failure to include issue in brief "would warrant our refusal to consider it"). As we observed in *Quarterman*, " 'justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination.' " *Quarterman* at ¶ 19, quoting *Sizemore v. Smith*, 6 Ohio St.3d 330, 333, 453 N.E.2d 632 (1983), fn. 2. Because Roberts failed to brief her Sixth Amendment claim, it is not properly before the court.

### Independent Sentence Review

{¶ 86} Pursuant to R.C. 2929.05, we are directed to independently review Roberts's death sentence and determine whether the evidence supports the jury's finding of aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors, and whether the death sentence is proportionate to those affirmed in similar cases.

### *Aggravating Circumstances*

{¶ 87} R.C. 2929.04 describes the death-penalty specifications to be included in an indictment and provides:

> (A) Imposition of the death penalty for aggravated murder is precluded unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:
> * * *
> (7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the

offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

{¶ 88} In this case, the jury returned verdicts finding Roberts guilty of two felony-murder specifications pursuant to R.C. 2929.04(A)(7): one predicated on aggravated burglary and one predicated on aggravated robbery. And on each of the felony-murder specifications, the jury found that Roberts had acted with prior calculation and design in the aggravated murder.

{¶ 89} We have previously determined that the state presented proof beyond a reasonable doubt to support the jury's verdict on the elements of aggravated robbery and on the corresponding R.C. 2929.04(A)(7) capital specification. *See Roberts I*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 122-130.

{¶ 90} The state also presented proof beyond a reasonable doubt to support the jury's finding of guilty in connection with the aggravated-burglary specification. The evidence at trial established that Jackson murdered Fingerhut during the commission of aggravated burglary and that Roberts aided and abetted in the commission of that crime. *See* R.C. 2923.01(A)(1) and (2).

{¶ 91} On December 8, Jackson told Roberts that he needed to be in the house when Fingerhut came home. The murder that Roberts and Jackson had planned over a two-month period took place in the house sometime between 9:00 p.m., when Fingerhut left work, and 12:01 a.m., when Roberts called 9-1-1. Jackson and Roberts were seen together several times on the day of the murder and had dinner at a restaurant, where they paid their check at 6:43 p.m.

{¶ 92} The evidence further showed that Jackson had Roberts's cell phone in his possession, and phone records introduced at trial established that he and Roberts were in near-constant communication between 9:45 and 11:45 p.m. on the

evening of the murder. And police found no signs of forced entry at the house, permitting the inference that Roberts encouraged Jackson to commit the aggravated burglary and gave him access to the house on the night of the murder, thereby aiding and abetting the killing and the aggravated burglary.

{¶ 93} Finally, the jury's finding of prior calculation and design as alleged in both capital specifications is supported by evidence of the correspondence and taped conversations in which Roberts and Jackson planned the murder, as well as Roberts's purchase of a ski mask and gloves for Jackson's use in carrying out the plan. *See Roberts I*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, at ¶ 35-84.

*Mitigating Factors*

{¶ 94} When considering whether the aggravating circumstances proved in this case outweigh the mitigating factors beyond a reasonable doubt, we review whether there is anything mitigating about the "nature and circumstances of the offense, [and] the history, character, and background of the offender," R.C. 2929.04(B), as well as the following specific mitigating factors: R.C. 2929.04(B)(1) (victim inducement), (B)(2) (duress, coercion, or strong provocation), (B)(3) (mental disease or defect), (B)(4) (youth of the offender), (B)(5) (lack of a significant criminal record), (B)(6) (accomplice only), and (B)(7) (any other relevant factors).

{¶ 95} At the mitigation hearing, Roberts declined to present any evidence but did make an unsworn statement. In that statement, she asserted that she would not beg the jury to spare her life. Instead, she used her statement to expose witnesses who she claimed had lied, cheated, and abused their power while testifying at trial. She disputed the testimony of various witnesses and the evidence recovered from the Days Inn. She complained that her home had been illegally searched and accused Sergeant Monroe, who had headed the

investigation, of planting evidence in order to further his ambition to become Howland Township chief of police.

{¶ 96} In her unsworn statement, Roberts contended that the trial had shown the jury approximately five percent of her life, including the eight times she had been with Jackson in the 14 months preceding the murder. She decried the media coverage of the case because the coverage allegedly had ignored her 40-year career as a businesswoman. She also criticized the jurors as "young inexperienced people" who did not read newspapers or watch the news.

{¶ 97} She derided the idea that she would murder someone for $250,000,[3] claiming that she and Fingerhut earned more than $200,000 per year. Roberts stated: "I had everything. Now I have nothing. But the most important thing I don't have is Robert [Fingerhut], and my two little girls"—her dogs. She then showed the jury photographs of the dogs.

{¶ 98} Roberts denied that her correspondence with Jackson reflected an actual plot to murder Fingerhut. She claimed that she had made a number of false statements to Jackson and that she actually loved Fingerhut "very much." She said Fingerhut "never laid a hand on me" and "gave me everything I wanted, the same as I did to him."

{¶ 99} Roberts also accused the prosecutor of appealing to racial and religious prejudice and used her statement "to demand racial equality." She explained that she had refused to present mitigating evidence so that the jury would have no choice but to return a death verdict. Her case and Jackson's, she argued, differed only in that she is white and he is black. Because Jackson had been sentenced to death, she told the jury, "the right thing" would be to sentence her to death too.

---

[3] In reality, Fingerhut's two life insurance policies had a combined benefit amount of over twice that. Roberts claimed in her unsworn statement that she had not known about one of the policies.

{¶ 100} In her October 22, 2007 allocution, Roberts told her life story. She was born in Youngstown in 1944. When she was five, her family moved to a farm in what is now Austintown. As a child, Roberts said, she "tried to be happy and positive," but because there were five children in the family, she never got any attention or affection, so she "always felt empty."

{¶ 101} Roberts stated that she grew up in an abusive household, observing her father beat and verbally abuse her mother. Roberts said she "spent a lot of time under [her] bed," especially "when guns came out." She also stated that, when she was very young, a cousin raped her, resulting in internal injuries.

{¶ 102} Roberts said she had always been on the honor roll in school and on the dean's list in college. After college, she married her first husband, moved to Florida, and had a son in 1969. Her son enlisted in the Army, served in the Judge Advocate General Corps, and then worked for the New Hampshire Attorney General's office.

{¶ 103} Roberts recounted a long history of motor-vehicle accidents and resulting injuries. In 1963, while attending college and working two jobs, she fell asleep while driving and had a collision. As a result, she was hospitalized. She told the jury, "[T]hey spent a long time picking glass out of me and I was like spacey for awhile." In 1983, a car ran a red light and collided with a car she was in. She was hospitalized again and went to a neurosurgeon for months afterward.

{¶ 104} In 1999, Roberts sustained serious injuries in a third accident. Roberts remembered being in the hospital, but after that she could not remember anything "for a long time." She said she suffered from depression after the accident, culminating in a suicide attempt. After this incident, she found herself in a psychiatric ward, where she claimed to have suffered from auditory hallucinations.

{¶ 105} After the suicide attempt, Roberts began falling down repeatedly, hitting her head, and losing track of what day it was. About seven months after

her hospitalization, the Social Security Administration sent her to a psychiatrist. As a result, Roberts began receiving benefits.

{¶ 106} Roberts stated that she worked for "almost 23 years" in a plastic surgeon's office, where they "helped a lot of people." She said that when she operated a restaurant in the Youngstown bus terminal that Fingerhut owned, she gave food and money to people who were short of money at the end of the month. She also gave several thousand dollars to help her sisters and her son.

{¶ 107} In 1980, Roberts converted to Judaism. She recounted how she had raised money to rescue an Ethiopian Jew who was in danger of being murdered in his home country. She also volunteered to assist wounded soldiers in Israel.

{¶ 108} Roberts renewed her accusation that the police had committed perjury at her trial. Contrary to both trial testimony and her own letter to Jackson, she insisted that she had plenty of money and did not need to ask Fingerhut for it.

{¶ 109} Roberts stated that she had been a "good writer" in high school and college, was "creative," and "had a great imagination." Her correspondence and conversations with Jackson, she said, were merely "stories." She never initiated discussions about "hurting anyone," but just went along and wrote "what he told me to write."

{¶ 110} Roberts concluded her allocution by saying: "I never intended for anything like that to happen * * * and I still can't believe it. We loved each other and we had a good life."

{¶ 111} The statutory mitigating factor set forth in R.C. 2929.04(B)(6) exists in this case, since the evidence at trial establishes that Roberts was not the principal offender in the aggravated murder. Nonetheless, she had a central role in the murder, which diminishes the weight of this factor. *See State v. Herring*, 94 Ohio St.3d 246, 267, 762 N.E.2d 940 (2002). There is no other evidence of the statutory mitigating factors in this record. *See Stumpf*, 32 Ohio St.3d at 101-

102, 512 N.E.2d 598 (defendant bears burden of proving existence of mitigating factors).

{¶ 112} Roberts's history, character, and background, as recounted in her allocution and reflected in the trial record, present some mitigating features. Roberts worked for a plastic surgeon in Florida, helped treat wounded soldiers in Israel, operated a restaurant, and helped Fingerhut run the bus terminals. Her work history and compassion for others deserve some weight in mitigation. *See*, *e.g.*, *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 281 (work history as mitigating factor). However, her uncorroborated claims of an unhappy childhood are entitled to little weight, as is her claimed history of mental problems stemming from injuries resulting from traffic accidents.

{¶ 113} In light of the trial evidence, her claim that she loved Fingerhut lacks credibility. And although she expressed sadness about Fingerhut's murder, she never accepted any responsibility for it; rather, she chose to deny that she had ever made plans with Jackson to kill Fingerhut, notwithstanding overwhelming evidence to the contrary.

{¶ 114} Finally, the nature and circumstances of the offense offer nothing in mitigation. Motivated at least in part by greed, she assisted Jackson in murdering Fingerhut in his home, which they planned prior to Jackson's release from prison.

*Sentence Evaluation*

{¶ 115} After our independent review and weighing, we find that the aggravating circumstances present in this case outweigh the mitigating factors beyond a reasonable doubt. The evidence of the recorded telephone calls and the letters exchanged between Roberts and Jackson shows that over a period of months, Roberts and Jackson planned to kill Fingerhut and that she facilitated the burglary of her home. Her active participation in the murder of Fingerhut and the

accompanying felonies was essential to successfully committing these crimes. By comparison, the mitigating factors carry little weight.

{¶ 116} We find that the death penalty in this case is appropriate and proportionate when compared with capital cases involving aggravated murder committed during aggravated burglary, *see State v. Davie*, 80 Ohio St.3d 311, 686 N.E.2d 245 (1997), and for aggravated murder committed during aggravated robbery, *see State v. Burke*, 73 Ohio St.3d 399, 653 N.E.2d 242 (1995); *State v. Raglin*, 83 Ohio St.3d 253, 699 N.E.2d 482 (1998).

{¶ 117} We further find that the death sentence is proportionate to the death sentence imposed on Jackson. *See State v. Jackson,* 107 Ohio St.3d 300, 2006-Ohio-1, 839 N.E.2d 362 (affirming death sentence), and *State v. Jackson*, 149 Ohio St.3d 55, 2016-Ohio-5488, 73 N.E.3d 414 (affirming death sentence on appeal from resentencing).

{¶ 118} Accordingly, we affirm the judgment of the Trumbull County Court of Common Pleas.

Judgment affirmed.

KENNEDY, FRENCH, FISCHER, and DEWINE, JJ., concur.

O'CONNOR, C.J., concurs in judgment only.

O'NEILL, J., concurs in part and dissents in part, for the reasons set forth in his dissenting opinion in *State v. Wogenstahl*, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900.

_____

Dennis Watkins, Trumbull County Prosecuting Attorney, and LuWayne Annos and Ashleigh Musick, Assistant Prosecuting Attorneys, for appellee.

David L. Doughten and Robert A. Dixon, for appellant.

_____