[Cite as *Toledo v. Corr. Comm. of N.W. Ohio*, 2017-Ohio-9149.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

City of Toledo

      Appellee

v.

Corrections Commission of
Northwest Ohio, et al.

      Appellants

Court of Appeals No. L-16-1155

Trial Court No. CI0201505017

**DECISION AND JUDGMENT**

Decided: December 20, 2017

* * * * *

Andy Douglas, Adam W. Loukx, Law Director, and John T. Madigan, Senior Attorney, for appellee.

Marc A. Fishel and Melanie Williamson, for appellants Corrections Commission of Northwest Ohio and the Boards of Commissioners of Defiance County, Fulton County, Henry County, and Williams County.

Fritz Byers, for appellant Lucas County Board of Commissioners.

Julia R. Bates, Lucas County Prosecuting Attorney, John A. Borell, Kevin A. Pituch, and Evy M. Jarrett, Assistant Prosecuting Attorneys, for appellant Lucas County Sheriff John Tharp.

Melissa M. Purpura, Director of Law, City of Oregon, for amicus curiae city of Oregon.

Beth A. Tischler, Director of Law, City of Maumee, for amicus curiae city of Maumee.

Leslie B. Brinning, Director of Law, City of Sylvania, for amicus curiae city of Sylvania.

Gallon, Takacs, Boissoneault & Schaffer, Co., LPA, and John M. Roca, for amici curae International Union of Police Associations, AFL-CIO, CCNO Supervisors Association Local 53, CCNO Corrections Officers Association Local 64 and CCNO Case Managers Association Local 79.

* * * * *

**KLATT, J.**

{¶ 1} Defendants-appellants, the Corrections Commission of Northwest Ohio ("Commission"), the Lucas County Board of Commissioners ("Board"), the Lucas County Sheriff ("Sheriff"), and the Boards of Commissioners of Defiance County, Fulton County, Henry County, and Williams County, appeal a judgment entered by the Lucas County Court of Common Pleas in favor of plaintiff-appellee, the City of Toledo. For the following reasons, we affirm that judgment.

{¶ 2} Toledo is the largest municipal corporation within Lucas County, Ohio. Toledo does not own or operate any type of detention facility. Individuals arrested in Toledo, who are denied bail or who are unable to make bail, are confined to the Lucas County Corrections Center ("LCCC").[1] The Sheriff operates the LCCC and has charge of

---

[1] A court must order the detention of an individual charged with a crime "[i]f [the] offense is not bailable, if the court denies bail to the accused, or if the accused does not offer sufficient bail." R.C. 2937.32.

2.

all individuals confined in it.  *See* R.C. 341.01 ("The sheriff shall have charge of the county jail and all persons confined therein.").

{¶ 3} Generally, if an individual is convicted of a misdemeanor offense by a court located in Toledo,[2] that individual serves any jail sentence imposed at the Corrections Center of Northwest Ohio ("CCNO").  CCNO is the product of agreements between Defiance County, Fulton County, Henry County, Lucas County, Williams County, and the City of Toledo to construct and operate a multicounty-municipal correctional center.  CCNO has operated under successive organizational and operational agreements since 1988.  In 2011, the five member counties and Toledo entered into the Fourth Amended and Restated Organizational and Operational Agreement for the Corrections Commission of Northwest Ohio's Multicounty-Municipal Correctional Center ("Fourth Agreement").

{¶ 4} Under the Fourth Agreement, the Commission was tasked with the management, maintenance, operation, occupation, repair, and administration of CCNO.  The Commission consisted of the sheriff and one member of the board of commissioners from each member county, and the Toledo chief of police and mayor.  The Fourth Agreement required the Commission to appoint an executive director, who was in charge of CCNO.

{¶ 5} As mandated by the Fourth Agreement and CCNO's fiscal agent, each member had to remit its share of CCNO's annual operating and capital costs on a quarterly

---

[2] Both the Toledo Municipal Court and the Lucas County Court of Common Pleas are located in Toledo.

3.

basis. The amount owed by each member depended on the number of beds reserved by the member. Toledo reserved 228 beds, or 35.65 percent of the available beds. Thus, Toledo owed 35.65 percent of CCNO's annual operating and capital costs. Lucas County, which reserved 203 beds, owed 31.84 percent of the annual operating and capital costs.

{¶ 6} The Fourth Agreement permitted the Commission to rent unused beds to members and non-members. The Commission charged a per diem rate for the rental of beds. If a member's unused beds were rented, that member received a credit based on its percentage of total unused bed space available on a monthly basis. The Commission entered that credit on the member's quarterly invoices as an off-set against the member's proportional share of the operating and capital costs.

{¶ 7} Finally, the Fourth Agreement provided that it could be "modified, amended or supplemented in any respect not prohibited by law upon the approval of the modification, amendment or supplement by a two-thirds roll call vote of the Commission representatives and by the governing bodies of at least two-thirds (2/3) of the Members." (Commission's Ex. F, Fourth Agreement, Section 10.) Once approved, the modification, amendment, or supplement would become binding on the Commission and all members.

{¶ 8} In 1998, CCNO's executive director codified the billing rules CCNO used. However, neither the billing rules nor the successive organizational and operational agreements addressed how to divide between Lucas County and Toledo the cost of housing prisoners sentenced to a jail term by a court located in Toledo. In practice, offenders convicted in the Toledo Municipal Court filled beds Toledo paid for, while offenders

4.

convicted in the Lucas County Court of Common Pleas filled beds Lucas County paid for.[3] Toledo challenged this practice in 2014.

{¶ 9} Toledo's challenge began because, on October 15, 2014, Toledo's mayor directed the Toledo Police Department to stop charging alleged offenders under the Toledo ordinances if a comparable Revised Code offense existed. This directive constituted a sea change, as the Toledo Police Department had previously charged misdemeanors mostly under Toledo's ordinances. After mandating this change, Toledo's mayor initiated a campaign to alter CCNO's billing practices. Toledo's mayor urged CCNO's executive director to charge Lucas County with the cost of housing all prisoners convicted of a violation of the Revised Code, regardless of which Toledo-based court sentenced the prisoner. Under the rule proposed by Toledo's mayor, Toledo would only have the responsibility of providing for those few prisoners convicted of violating ordinances for which there was no Revised Code equivalent.

{¶ 10} The executive director capitulated. On October 27, 2014, the executive director adopted the rule that, "[i]f the City of Toledo issues a criminal complaint under the Ohio Revised Code versus [the] Toledo Municipal Code[,] that charge is billed to Lucas County." (Commission's Ex. K, CCNO Ohio Billing Rules, Rule 13.) CCNO then began assigning beds based on the type of offense (i.e., an ordinance violation versus a state law

---

[3] Additionally, offenders sentenced to jail time in the municipal courts of Maumee, Sylvania, and Oregon occupied Lucas County beds. Maumee, Sylvania, and Oregon are all municipal corporations located in Lucas County.

violation), instead of the sentencing court (i.e., Toledo Municipal Court versus Lucas County Court of Common Pleas).

{¶ 11} As a result of the rule change, offenders who had once filled Toledo beds began occupying Lucas County beds instead. Lucas County soon developed a need for more beds than the 203 beds that it had reserved. Toledo, on the other hand, had numerous empty beds. CCNO began billing Lucas County thousands of dollars, in addition to its proportional share of costs, for the rental of extra beds. At the same time, CCNO issued credits to Toledo for the rental of its empty beds to Lucas County.

{¶ 12} Lucas County resisted this cost transfer. At that time, an ad hoc committee was drafting the Fifth Amended and Restated Organizational and Operational Agreement for the Corrections Commission of Northwest Ohio's Multicounty-Municipal Correction Center ("Fifth Agreement"). As a result of Lucas County's efforts, the committee added to the draft a section stating:

> All Members which are a municipal corporation and operate a municipal
> court established in Section 1901.02 of the Ohio Revised Code bear the
> fiscal responsibility for the costs of incarceration of inmates/prisoners
> originating out of the jurisdiction of their municipal court, regardless of the
> criminal code for which the prisoner is held or sentenced.

(Commission's Ex. S, Fifth Agreement, Section 7(L).) This section was intended to reimpose on Toledo the obligation to pay the costs for all prisoners sentenced by the Toledo Municipal Court, no matter what the nature of the offense charged.

6.

{¶ 13} At the Commission's May 27, 2015 meeting, the Commission adopted the Fifth Agreement. With the exception of one abstention, all of the five counties' representatives voted in favor of the Fifth Agreement. Toledo's mayor and chief of police cast the only dissenting votes. Subsequently, the boards of commissioners of the five member counties approved the Fifth Agreement. Toledo refused to approve the Fifth Agreement, and its director of finance did not certify that Toledo possessed, or was in the process of collecting, the amount required to meet Toledo's financial obligations under the Fifth Agreement.

{¶ 14} On December 7, 2015, Toledo filed an action against the Commission; the Boards of Commissioners of Defiance County, Fulton County, Henry County, Lucas County, and Williams County; and the Sheriff. Along with other claims, Toledo sought declaratory judgments stating that: (1) Lucas County was responsible for the costs of housing state prisoners,[4] regardless of what authority committed the arrest and what Toledo-based court imposed the sentence, and (2) the Fifth Agreement was not binding on Toledo. The Commission and each of the named Boards of Commissioners filed counterclaims against Toledo.

{¶ 15} The trial court ordered the parties to brief the issues raised by Toledo's claims for declaratory judgment. In its briefing, Toledo argued that it only had a statutory obligation to pay for housing individuals charged and convicted of violations of Toledo's

---

[4] In its complaint, Toledo defined "state prisoners" as pretrial detainees and sentenced misdemeanants who were charged or sentenced under the Revised Code.

7.

ordinances. Toledo maintained that Lucas County was responsible for the costs of incarcerating those charged and convicted of state law misdemeanors. In response, the Board and Sheriff asserted that the statutory duty to pay for housing prisoners turned on the court that adjudicated the prisoners' cases, not the type of offense. The Board and Sheriff thus contended that Toledo had to pay to house those prisoners under the jurisdiction of the Toledo Municipal Court, while Lucas County had the responsibility to pay for housing prisoners under the jurisdiction of the Lucas County Court of Common Pleas.

{¶ 16} As to its second claim, Toledo argued that it was bound by the Fourth Agreement, but not the Fifth Agreement. The Commission[5] asserted that Toledo was obligated to perform under the Fifth Agreement, even though Toledo neither adopted it nor certified the availability of funds to meet the payment terms contained in it.

{¶ 17} In a judgment issued June 27, 2016, the trial court granted Toledo summary judgment on each of its claims. The trial court declared that, "where a municipal police department arrests, detains and charges an individual pursuant to a violation of state law, it is the county who is financially responsible for the incarceration of that individual and the accompanying costs associated therewith." (June 27, 2016 Order at 5.) The trial court also

---

[5] The Boards of Commissioners of Defiance County, Fulton County, Henry County, and Williams County joined the Commission in its trial court and appellate briefing. For the ease of discussion, we hereinafter will refer to those appellants collectively as "the Commission."

8.

declared that the Fifth Agreement did not bind Toledo, and instead, the Fourth Agreement delineated Toledo's contractual rights and responsibilities.[6]

{¶ 18} The Commission, Board, and Sheriff appealed the June 27, 2016 judgment. On appeal, the Commission assigns the following errors:

[1.] The Lucas County Court of Common Pleas erred when it granted Partial Summary Judgment to the City and determined the City was not bound to the Fifth Amended Agreement.

[2.] The Lucas County Court of Common Pleas erred when it granted Partial Summary Judgment to the City and determined that Ohio Revised Code § 307.93 requires unanimous consent of CCNO members to amend its Operating Agreement.

{¶ 19} The Board assigns the following error:

The trial court erred in entering partial summary judgment in favor of Plaintiff-Appellee and against Defendant-Appellant.

{¶ 20} The Sheriff assigns the following error:

The Common Pleas Court committed prejudicial error when it granted the City of Toledo's motion for summary judgment and when it denied the Sheriff's motion for summary judgment.

---

[6] Although claims remain pending below, the trial court included Civ.R. 54(B) language in its judgment. We, therefore, may review this partial judgment on appeal.

9.

{¶ 21} We will begin our review with the Board's and Sheriff's assignments of error. Both of these assignments of error challenge the trial court's conclusion that, under Ohio law, Lucas County must pay the cost of incarcerating individuals charged with or convicted of state law misdemeanors, regardless of the court that adjudicates those individuals' cases. The Board and Sheriff argue that the trial court's conclusion is wrong because the court ignored R.C. 753.02(A). According to the Board and Sheriff, R.C. 753.02(A) imposes upon Toledo the duty to: (1) operate its own detention facility or contract with Lucas County to house prisoners, and (2) pay for housing all prisoners charged with or convicted of a misdemeanor in the Toledo Municipal Court. In response, Toledo asserts that R.C. 753.02(A) is irrelevant.

{¶ 22} To resolve the parties' dispute, we must construe the language of R.C. 753.02(A). A question of statutory construction presents an issue of law that appellate courts review de novo. *Lang v. Dir., Ohio Dept. of Job & Family Servs.*, 134 Ohio St.3d 296, 2012-Ohio-5366, ¶ 12. The goal of statutory construction is to ascertain and give effect to the General Assembly's intent. *Hulsmeyer v. Hospice of Southwest Ohio, Inc.*, 142 Ohio St.3d 236, 2014-Ohio-5511, ¶ 21; *Summerville v. Forest Park*, 128 Ohio St.3d 221, 2010-Ohio-6280, ¶ 18. In determining that intent, courts first look to the statutory language and the purpose to be accomplished. *Hulsmeyer* at ¶ 21. When a statute's meaning is clear and unambiguous, courts apply the statute as written. *Summerville* at ¶ 18. In such a situation, courts have no basis for resorting to rules of statutory interpretation, as an unambiguous statute is to be applied, not interpreted. *Jacobson v.*

*Kaforey*, 149 Ohio St.3d 398, 2016-Ohio-8434, ¶ 8. If, however, a statute is ambiguous, " 'courts seek to interpret the statutory provision in a manner that most readily furthers the legislative purpose as reflected in the wording used in the legislation.' " *State v. Black*, 142 Ohio St.3d 332, 2015-Ohio-513, ¶ 38, quoting *State ex rel. Toledo Edison Co. v. Clyde*, 76 Ohio St.3d 508, 513 (1996). To discern that purpose, courts may consider several factors, including the object sought to be obtained, the legislative history, and the consequences of a particular construction. R.C. 1.49.

{¶ 23} In its entirety, R.C. 753.02(A) states:

The legislative authority of a municipal corporation shall provide by ordinance for sustaining all persons sentenced to or confined in a prison or station house at the expense of the municipal corporation, and in counties where prisons or station houses are in quarters leased from the board of county commissioners, may contract with the board for the care and maintenance of those persons by the sheriff or other person charged with the care and maintenance of county prisoners. On the presentation of bills for food, sustenance, and necessary supplies, to the proper officer, certified by the person whom the legislative authority designates, the officer shall audit the bills under the rules prescribed by the legislative authority, and

11.

draw the officer's order on the treasurer of the municipal corporation in favor of the person presenting the bill.[7]

{¶ 24} Initially, we see nothing in the plain language of R.C. 753.02(A) that requires a municipal corporation to either operate its own detention facility or contract with the county for the housing of prisoners. Outside of R.C. 753.02(A), the Revised Code contains multiple statutes governing municipal corporations' ability to establish and operate a detention facility. *See* R.C. 715.16(A) ("Any municipal corporation may: (A) Establish, erect, maintain, and regulate jails, * * * workhouses, station houses, [and] prisons * * *."); R.C. 717.01(F) ("Each municipal corporation may do any of the following: * * * Construct * * * prisons * * *."); R.C. 753.21(B) (authorizing the legislative authority of a municipal corporation to permit the use of certain types of structures as a minimum security jail). By the repeated use of the word "may," these statutes permit, but do not require, a municipal corporation to found and run a detention facility. *See Smucker v. Levin*, 113 Ohio St.3d 337, 2007-Ohio-2073, ¶ 14 ' "May" is generally construed to render optional, permissive, or discretionary the provision in which it is embodied.' "). Nothing in R.C. 753.02(A) transforms this statutory authority to

---

[7] A "station house" is "[a] building for the temporary detention of offenders, attached to or under the jurisdiction of a police station." *Oxford English Dictionary* (3d Ed.2012).

12.

establish a municipal detention facility into a statutory mandate. Rather, the only mandate in R.C. 753.02(A) is the provision of payment for the sustenance of certain prisoners.[8]

{¶ 25} Moreover, R.C. 753.02(A) contains no requirement that a municipal corporation contract with the county for the detention of prisoners. If the municipal corporation leases space from the county for a prison or station house, then the municipal corporation "may contract" with the county for the sheriff to care for and maintain the prisoners housed in that space. R.C. 753.02(A). Due to the use of "may," the statute leaves the option to contract to the municipal corporation's discretion. *See Smucker* at ¶ 14. When the municipal corporation choses to enter such a contract, it must pay the county for the "food, sustenance, and necessary supplies" the sheriff provides to the prisoners. R.C. 753.02(A).

{¶ 26} Given the plain language of R.C. 753.02(A), we reject the Board's and Sheriff's contention that the statute compels a municipal corporation to either operate its own detention facility or contract with the county to house and sustain prisoners. R.C. 753.02(A) does not address the establishment of detention facilities at all, and it permits, but does not require, a municipal corporation to contract with the county. Accordingly, we turn to the question of whether R.C. 753.02(A) requires Toledo to assume the costs of imprisoning individuals charged with or convicted of misdemeanors in the Toledo Municipal Court.

---

[8] We discuss below the category of prisoners that municipal corporations must pay to sustain.

13.

**{¶ 27}** Indisputably, by the first clause of the first sentence of R.C. 753.02(A), the General Assembly imposes a duty on municipal corporations to pay the cost of sustaining prisoners. The statute, however, is less clear regarding which prisoners municipal corporations must provide sustenance. Pursuant to the plain language of the statute, municipal corporations must pay for sustaining "all persons sentenced to or confined in a prison or station house." R.C. 753.02(A). If we read this language literally, we would necessarily conclude that municipal corporations have to shoulder the expense of sustaining all individuals held in any Ohio prison, including those institutions under the control of the Department of Rehabilitation and Correction. This reading is implausible, and consequently, we must delve further into R.C. 753.02(A) to determine its meaning. *See State v. Roberts*, 150 Ohio St.3d 47, 2017-Ohio-2998, ¶ 47 (" 'It is a cardinal rule of statutory construction that a statute should not be interpreted to yield an absurd result.' "); *accord* R.C. 1.47(C) (courts must presume that the General Assembly intended a "just and reasonable result" when enacting a statute).

**{¶ 28}** In order to ascertain the meaning of R.C. 753.02(A), we turn to the history of the statute. The General Assembly first enacted the statutory language that now appears in R.C. 753.02(A) in 1869 as part of a comprehensive act providing for the organization and government of municipal corporations. For our purposes, three sections enacted in 1869 are relevant:

> Sec. 215. The council of any city or incorporated village shall have power to erect, establish and maintain a prison and one or more watch or

14.

station houses, as shall be necessary; and such prison, watch or station houses shall be under the control of the marshal, or chief of police, under such rules and regulations as the council may prescribe.

Sec. 216. It shall be the duty of the marshal or chief of police to provide all persons confined to such prison, watch or station houses, with necessary food during such confinement, and to see that such places of confinement are kept clean and made comfortable for the inmates thereof.

Sec. 217. The council shall provide, by ordinance, for sustaining all persons sentenced to or confined in such prison at the expense of the corporation; and on the presentation of bills for food, sustenance and necessary supplies to the proper officer, certified to by such person or persons as the council may designate, not exceeding forty cents a day, such officer shall audit the same under such rules and regulations as the council may prescribe, and draw his order on the treasurer of the corporation in favor of the officer presenting such bill.

66 Ohio Laws 185-86.

{¶ 29} This historical context elucidates the meaning of R.C. 753.02(A). Section 217 of the 1869 act required a municipal corporation to pay for sustaining all persons sentenced to or confined in "such prison," i.e., the prison the municipal corporation had the power to erect, establish, and maintain pursuant to Section 215. Thus, the statute, as

15.

originally passed, required municipal corporations to pay for the sustenance of prisoners sentenced to or confined in *municipal* prisons or station houses.

{¶ 30} Although much of the context that surrounded the 1869 statute has fallen away, the language of present-day R.C. 753.02(A) corresponds closely with its predecessor.  Moreover, even today, the Revised Code permits municipal corporations to "[e]stablish, erect, maintain, and regulate * * * station houses [and] prisons."  R.C. 715.16(A).  Given the consistency in the relevant statutory language, we conclude that R.C. 753.02(A) serves the same purpose it served when originally enacted.  Thus, R.C. 753.02(A) requires a municipal corporation to pay the expense of sustaining those persons it holds in the prison or station house that it establishes or maintains.[9]

{¶ 31} Our conclusion is strengthened by the two cases that have reviewed R.C. 753.02(A) and determined its meaning.  In *Univ. Hosps. v. Cleveland*, 28 Ohio Misc. 134, 138 (C.P.1971), the Cuyahoga County Court of Common Pleas held that R.C. 753.02 "clearly provides that the municipal corporation shall provide for the sustenance of all persons sentenced to or confined in a *municipal* prison."  (Emphasis added.)  Likewise, the Ninth District Court of Appeals determined that R.C. 753.02(A) places upon a municipal corporation "the responsibility of furnishing necessities to persons confined in *its* prison." (Emphasis added.)  *Akron City Hosp. v. Akron*, 9th Dist. No. 12133 (Oct. 30, 1985).

---

[9] This obligation pertains to a municipal corporation regardless of whether it establishes and maintains its own prison or station house, or it leases space from the county in which to establish and maintain a prison or station house.

16.

{¶ 32} Because R.C. 753.02(A) only requires a municipal corporation to pay for the sustenance of prisoners detained in its prison or station house, the statute does not become relevant unless a municipal corporation has a prison or station house. Toledo does not possess a prison or station house. R.C. 753.02(A), therefore, does not impose any financial obligations on Toledo.

{¶ 33} The Board and Sheriff cite multiple cases that they characterize as supporting their argument that Toledo must pay for the care and sustenance of all prisoners charged with or convicted of misdemeanors in the Toledo Municipal Court. These cases, however, conform with our interpretation of R.C. 753.02(A). A decision from this court, *St. Vincent Hosp. & Med. Ctr. v. Shatzer*, 6th Dist. No. L-85-150 (Jan. 31, 1986) illustrates this point.

{¶ 34} In *Shatzer*, a prisoner held in the Norwalk City Jail deliberately set a fire, which seriously burned him. The prisoner received medical treatment at St. Vincent Hospital, and the hospital sued the city seeking payment for the medical services it rendered to the prisoner. After quoting R.C. 753.02(A), this court held that Norwalk was liable for the costs of the prisoner's medical care because it had exerted actual, physical dominion and control over the prisoner at the time of his injury.

{¶ 35} Under our interpretation of R.C. 753.02(A), a municipal corporation must pay to sustain the prisoners held in its prison or station house. In *Shatzer*, we required Norwalk to pay for the medical care of a prisoner because that prisoner was held in Norwalk's jail when he suffered injury. Our conclusion in *Shatzer* that care is incident to

17.

custody is completely consistent with a municipal corporation's duty, under R.C. 753.02(A), to assume the cost of providing sustenance for the prisoners it holds in its prison or station house.

{¶ 36} Finally, the rules of statutory interpretation preclude us from adopting the Board's and Sheriff's interpretation of R.C. 753.02(A). Both the Board and Sheriff construe R.C. 753.02(A) to obligate a municipal corporation to pay the cost of sustaining prisoners charged with or convicted of misdemeanors in the municipal court located in the municipal corporation. However, nothing in the text of R.C. 753.02(A) premises a municipal corporation's payment obligation on the kind of court that adjudicates prisoners' cases. Therefore, to interpret R.C. 753.02(A) as the Board and Sheriff advocate, we would have to add language to the statute. We cannot do this. *See In re Application of Columbus S. Power Co.*, 147 Ohio St.3d 439, 2016-Ohio-1608, ¶ 49 ("But in construing a statute, we may not add or delete words."); *Hulsmeyer*, 142 Ohio St.3d 236, 2014-Ohio-5511, at ¶ 23 ("[C]ourt[s] must give effect to the words used, making neither additions nor deletions from words chosen by the General Assembly.").

{¶ 37} In sum, we conclude that R.C. 753.02(A) does not require Toledo to pay for housing prisoners charged with or convicted of misdemeanors in the Toledo Municipal Court. We, therefore, turn our attention to R.C. 1905.35, the statute that Toledo claims resolves how to divide imprisonment costs between it and Lucas County.

18.

**{¶ 38}** Pursuant to R.C. 1905.35:

Imprisonment under the ordinances of a municipal corporation shall be in the workhouse or other jail of the municipal corporation. Any municipal corporation not provided with a workhouse, or other jail, may, for the purpose of imprisonment, use the county jail, at the expense of the municipal corporation, until the municipal corporation is provided with a prison, house of correction, or workhouse. Persons so imprisoned in the county jail are under the charge of the sheriff. Such sheriff shall receive and hold such persons in the manner prescribed by the ordinances of the municipal corporation, until such persons are legally discharged.

"Imprisonment," as used in R.C. 1905.35, means "being imprisoned under a sentence imposed for an offense or serving a term of imprisonment, prison term, jail term, term of local incarceration, or other term under a sentence imposed for an offense * * *." R.C. 1.05(A).

**{¶ 39}** Under the plain language of R.C. 1905.35, a municipal corporation must pay the cost of housing persons convicted of a city ordinance, either by incarcerating those persons in its own detention facility or reimbursing the sheriff for maintaining such persons in the county jail. Moreover, by explicitly requiring municipal corporations to pay for the incarceration of ordinance violators, R.C. 1905.35 implicitly relieves municipal corporations from the obligation to pay for incarcerating state law violators. *See Myers v. Toledo*, 110 Ohio St.3d 218, 2006-Ohio-4353, ¶ 24 ("The canon *expressio unius est*

*exclusio alterius* tells us that the express inclusion of one thing implies the exclusion of the other.").

**{¶ 40}** As applied to the case at bar, R.C. 1905.35 allocates to Toledo the obligation to pay for imprisoning misdemeanants convicted of ordinance violations. Lucas County, consequently, must pay the costs of imprisoning misdemeanants convicted of state law violations.

**{¶ 41}** In arguing to the contrary, the Board and Sheriff assert that R.C. 1905.35 does not apply to this case because that statute appears in R.C. Chapter 1905, which is entitled "Mayor's Court." Pointing to R.C. 1905.35's location in the statutory framework, the Board and Sheriff contend that R.C. 1905.35 pertains only when a mayor's court sentences an individual to imprisonment. We disagree.

**{¶ 42}** If the language of a statute is plain and unambiguous, a court must apply, not interpret, that statute. *Jacobson*, 149 Ohio St.3d 398, 2016-Ohio-8434, at ¶ 8. Courts " 'do not have the authority' to dig deeper than the plain meaning of an unambiguous statute 'under the guise of either statutory interpretation or liberal construction.' " *Id.*, quoting *Morgan v. Ohio Adult Parole Auth.*, 68 Ohio St.3d 344, 347 (1994). In other words, courts cannot look beyond the language of an unambiguous statute to determine its meaning. *See Jones v. Action Coupling & Equip.*, 98 Ohio St.3d 330, 2003-Ohio-1099, ¶ 12 ("When the statutory language is plain and unambiguous, and conveys a clear and definite meaning, we must rely on what the General Assembly has said."). Thus, while the location of a statute

20.

in the Revised Code framework may influence the interpretation of an ambiguous statute, such a consideration has no place in the interpretation of an unambiguous statute.

{¶ 43} Here, R.C. 1905.35 is an unambiguous statute that requires a municipal corporation to pay for "[i]mprisonment under the ordinances of [the] municipal corporation." We, therefore, have no cause to go further than the plain language of the statute to determine its meaning. Because that language does not limit the statute's application to imprisonment ordered by a mayor's court, we must reject the Board's and Sheriff's interpretation of R.C. 1905.35.

{¶ 44} R.C. 1905.35, however, only provides a partial answer to whether Toledo or Lucas County must pay for housing prisoners charged with or convicted of a misdemeanor in a Toledo-based court. R.C. 1905.35 addresses postconviction imprisonment; it gives no guidance as to which governmental subdivision must pay for housing pretrial detainees. Fortunately, the Board has provided us with direction. The Board has conceded that, "[w]hen a detainee is housed in the county jail, the sheriff has actual custody, and responsibility for the costs of confinement rests on the County without regard to any statute-ordinance distinction." (Board's Reply Brief at 7.)

{¶ 45} The Board's concession is consistent with the law governing the circumstances present in Lucas County. As we stated above, individuals arrested in Toledo for misdemeanor violations are housed in the LCCC if they are denied bail or cannot pay the bail amount set by the court. The Sheriff has charge of the LCCC and all persons confined there. R.C. 341.01. The Sheriff has the duty to "keep * * * persons [confined in

21.

the county jail] safely, attend to the jail, and govern and regulate the jail according to the minimum standards for jails in Ohio promulgated by the department of rehabilitation and correction." *Id.* Under the standards applying to full-service jails, the Sheriff must provide a minimum level of security, sanitation, food, clothes, bedding, and medical services to LCCC inmates. *See* Ohio Adm.Code Chapter 5120:1-8. Lucas County, therefore, must bear the cost of providing housing, food, clothes, bedding, and medical care to LCCC prisoners, including pretrial detainees with misdemeanor cases pending before the Toledo Municipal Court. *See Shatzer*, 6th Dist. No. L-85-150 (Jan. 31, 1986) (ordering the city to pay the cost of medical care provided to a prisoner in the custody of the city jail because " 'care * * * is incident * * * to the custody' "); *Akron City Hosp.*, 9th Dist. No. 12133 (Oct. 30, 1985) (holding that "[p]rovision of sustenance is a natural corollary to physical custody of the person," and thus, ordering the city to pay for the medical care of a prisoner who fell ill while in the custody of the city corrections facility). In short, Lucas County must pay to maintain all prisoners in the Sheriff's custody.[10]

{¶ 46} As a final matter, we acknowledge that the Board and Sheriff argue that allocating the imprisonment costs as the trial court did contradicts sound public policy.

---

[10] We recognize that the effect of our conclusion is that Lucas County has the obligation to pay for housing pretrial detainees charged with any misdemeanor, regardless of whether that misdemeanor is a state law offense or ordinance offense. However, given the assignments of error before us, the only question under our review is whether the trial court erred in imposing on Lucas County the responsibility to pay for imprisoning those alleged to have violated *state law*. As Toledo did not appeal the trial court's judgment, we expressly decline to rule regarding which governmental subdivision must pay for housing detainees alleged to have violated *ordinances*.

22.

We, however, must leave that argument to the General Assembly to decide. The General Assembly, not the judiciary, resolves public policy issues. *Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-278, ¶ 14; *accord Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, ¶ 71 ("[T]he General Assembly is charged with making the difficult policy decisions * * * and codifying them into law."). Courts do not second-guess the General Assembly's policy choices. *Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St.3d 280, 2010-Ohio-1029, ¶ 93. Rather, where the General Assembly has spoken, and in so speaking violated no constitutional provision, the courts must follow and apply the legislature's expression of public policy. *Yoder v. Thorpe*, 10th Dist. No. 07AP-225, 2007-Ohio-5866, ¶ 38.

{¶ 47} In this case, we have followed and applied the relevant statutes to determine which governmental subdivision must pay the cost of imprisoning individuals charged with or convicted of misdemeanors in the Toledo Municipal Court. If the General Assembly wishes to change the law, it is free to do so.

{¶ 48} In sum, we conclude that the trial court did not err in declaring that Lucas County must bear the cost of housing individuals charged with or convicted of state law misdemeanors in Toledo Municipal Court. We note that the trial court also found Lucas County responsible for the "accompanying" or "attendant" costs of housing the relevant prisoners. Those "accompanying" or "attendant" costs are the costs associated with housing prisoners in a detention facility compliant with the minimum standards applicable to full-service jails. *See* Ohio Adm.Code 5120:1-8. Having found no error in the trial

23.

court's first declaration, we overrule the Board's assignment of error and the portion of the Sheriff's assignment of error that relates to that declaration.

{¶ 49} We next turn to the second issue presented in this appeal. By the Commission's first assignment of error and the Sheriff's assignment of error, the Commission and Sheriff argue that the trial court erred in declaring that the Fifth Agreement was not binding on Toledo. We disagree.

{¶ 50} Toledo argues that the Fifth Agreement does not bind it because its director of finance did not certify the availability of funds as required in R.C. 5705.41 and Chapter XIII, Sections 226 and 229, of Toledo's Charter. In relevant part, R.C. 5705.41 states that "[n]o subdivision or taxing unit shall:"

> (D) (1) Except as otherwise provided in division (D)(2) of this section and section 5705.44 of the Revised Code, make any contract or give any order involving the expenditure of money unless there is attached thereto a certificate of the fiscal officer of the subdivision that the amount required to meet the obligation or, in the case of a continuing contract to be performed in whole or in part in an ensuing fiscal year, the amount required to meet the obligation in the fiscal year in which the contract is made, has been lawfully apportioned for such purpose and is in the treasury or in process of collection to the credit of an appropriate fund free from any previous encumbrances. * * * Every such contract made without such a certificate

24.

shall be void, and no warrant shall be issued in payment of any amount due thereon.

The definition of "subdivision," as used in R.C. 5705.41, encompasses all municipal corporations, including those municipal corporations that have a charter under Article XVIII of the Ohio Constitution. R.C. 5705.01(A) and (B).[11]

{¶ 51} Under the plain language of R.C. 5705.41(D)(1), a subdivision generally "cannot enter into a contract that requires spending public money unless the fiscal officer of that subdivision certifies that the entire amount required to satisfy the obligation has been appropriated for that purpose and is available and unencumbered." *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, ¶ 49. The failure to attach a certificate as required by R.C. 5705.41(D)(1) is fatal to the validity of the contract. *Pincelli v. Ohio Bridge Corp.*, 5 Ohio St.2d 41 (1966), paragraph four of the syllabus; *NaphCare, Inc. v. Cty. Council Ohio*, 9th Dist. No. 24906, 2010-Ohio-4458, ¶ 11. The certification requirement is intended " 'to preclude the creation of any valid obligation against the [subdivision] above or beyond the fund previously provided and at hand for such purpose.' " *St. Marys* at ¶ 49, quoting *State v. Kuhner*, 107 Ohio St. 406, 413 (1923).

---

[11] Sections 226 and 229 of the Toledo Charter are substantively identical to R.C. 5705.01(D)(1). Section 226 of the Toledo Charter requires the same certification as R.C. 5705.01(D)(1), and Section 229 states that all contracts without the necessary certification are void.

25.

{¶ 52} The Commission and Sheriff do not contest that the Fifth Agreement lacks a R.C. 5705.41(D)(1) certificate signed by Toledo's director of finance. Instead, the Commission and Sheriff argue that R.C. 5705.41(D)(1) does not apply to contracts between political subdivisions. Because all the parties to the Fifth Agreement are political subdivisions, the Commission and Sheriff contend that the absence of a R.C. 5705.41(D)(1) certificate from Toledo's director of finance does not invalidate that agreement.

{¶ 53} In support of their argument, the Commission and Sheriff cite *Bd. of Cty. Commrs. v. Bd. of Twp. Trustees*, 3 Ohio App.3d 336 (7th Dist.1981), and two cases following it.[12] In *Bd. of Cty. Commrs.*, the Board of Trustees of Island Creek Township entered into a contract with the Board of Commissioners of Jefferson County for Jefferson County to service and supply water to Island Creek's fire hydrants. The contract did not include an R.C. 5705.41(D)(1) certificate. Island Creek stopped paying under the contract, and Jefferson County sued it. In response, Island Creek argued that it was not bound by the contract because the contract lacked an R.C. 5705.41(D)(1) certificate. The Seventh District Court of Appeals disagreed, concluding that R.C. 5705.41(D)(1) did not apply when two political subdivisions contract with each other.

---

[12] The two cases are *Rua v. Shillman*, 28 Ohio App.3d 63 (11th Dist.1985), and *Sagamore Hills Twp. v. Troutman*, 9th Dist. No. 11159 (Jan. 18, 1984).

**{¶ 54}** R.C. 5705.41(D)(1) contains two enumerated exceptions; namely, it permits a subdivision to contract without an R.C. 5705.41(D)(1) certificate as "provided in division (D)(2) of [R.C. 5705.41] and [R.C.] 5705.44." Neither R.C. 5705.41(D)(2) nor R.C. 5705.44 exempt contracts between two or more public subdivisions from the operation of R.C. 5705.41(D)(1).[13] The exception created in *Bd. of Cty. Commrs.*, therefore, has no statutory basis.

**{¶ 55}** "When a statutory provision imposing a mandatory obligation has specifically enumerated exceptions, a court does not have discretion to create additional exceptions." *State v. Vanzandt*, 142 Ohio St.3d 223, 2015-Ohio-236, ¶ 15; *accord State ex rel. Sapp v. Franklin Cty. Ct. of Appeals*, 118 Ohio St.3d 368, 2008-Ohio-2637, ¶ 26

---

[13] R.C. 5705.41(D)(2) allows boards of county commissioners to "adopt a resolution exempting county purchases of one thousand dollars or less from the requirement of division (D)(1) of this section that a certificate be attached to any contract or order involving the expenditure of money." R.C. 5705.44 provides:

> The certificate required by section 5705.41 of the Revised Code as to money in the treasury shall not be required for contracts on which payments are to be made from the earnings of a publicly operated water works or public utility, but in the case of any such contract made without such certification, no payment shall be made on account thereof, and no claim or demand thereon shall be recoverable, except out of such earnings. That certificate also shall not be required if requiring the certificate makes it impossible for a county board of developmental disabilities to pay the nonfederal share of medicaid expenditures that the county board of is required by sections 5126.059 and 5126.0510 of the Revised Code to pay.

Additionally, we note that R.C. 5705.412, which governs "qualifying contract[s]" made by school districts, applies to school districts "[n]otwithstanding [R.C.] 5705.41." R.C. 5705.412(B)(1).

27.

(when the plain language of a statute does not recognize the exception sought, the court could not add it); *State ex rel. Stoll v. Logan Cty. Bd. of Elections*, 117 Ohio St.3d 76, 2008-Ohio-333, ¶ 39 ("But the statute contains no exception, and we cannot add one to its express language.").  Here, R.C. 5705.41(D)(1) imposes a mandatory obligation on subdivisions to attach a certificate from its fiscal officer to any contract it makes, with specifically enumerated exceptions.  Those enumerated exceptions do not include contracts between two or more public subdivisions.  Consequently, in the cases the Commission and Sheriff cite, the courts exceeded the boundaries of their discretion in applying an uncodified exception to the R.C. 5105.41(D)(1) requirement.  For this reason, we cannot follow those cases.

{¶ 56} Next, the Sheriff argues that R.C. 307.19 exempts the Fifth Agreement from compliance with R.C. 5105.41(D)(1).  R.C. 307.19 states:

> Sections 307.14 to 307.19, inclusive, of the Revised Code, do not repeal or abrogate other sections of the Revised Code authorizing contracts or agreements among particular classes of subdivisions, or modify or impair the force of such sections in respect of contracts or agreements entered into under such sections.  Nor shall such other sections control or limit the making of agreements under sections 307.14 to 307.19, inclusive, of the Revised Code; it being intended that such sections shall be applied as fully as though such other sections did not exist.

28.

**{¶ 57}** Relying on the second sentence of R.C. 307.19, the Sheriff argues that no Revised Code sections, other than R.C. 307.14 to 307.19, control or limit the Fifth Agreement, which the parties made under R.C. 307.15. Thus, the Sheriff contends, the requirements of R.C. 5105.41(D)(1) do not exist as to the Fifth Agreement.

**{¶ 58}** The Sheriff misreads R.C. 307.19. The "such other sections" that do not control or limit agreements made under R.C. 307.14 to 307.19 are "other sections of the Revised Code authorizing contracts or agreements among particular classes of subdivisions." To reach his interpretation, the Sheriff disregards the limiting phrase "authorizing contracts or agreements among particular classes of subdivisions." The Sheriff interprets R.C. 307.19 as if the "such other sections" that do not control or limit agreements made under R.C. 307.14 to 307.19 were *all* "other sections of the Revised Code."

**{¶ 59}** However, in interpreting a statute, courts cannot delete language used in the statute. *Cleveland Elec. Illuminating Co. v. Cleveland*, 37 Ohio St.3d 50 (1988), paragraph three of the syllabus ("In matters of construction, it is the duty of [a] court to give effect to the words used, not to delete words used or to insert words not used."). Read in its entirety, R.C. 307.19 does not exempt contracts made under R.C. 307.15 from all other Revised Code sections. Instead, R.C. 307.19 only exempts contracts made under R.C. 307.15 from other Revised Code sections "authorizing contracts or agreements among particular classes of subdivisions."

29.

{¶ 60} R.C. 5105.41(D)(1) does not authorize contracts or agreements among particular classes of subdivisions. R.C. 307.19, therefore, does not preclude the application of R.C. 5105.41(D)(1) to the Fifth Agreement.

{¶ 61} In sum, we reject all the reasons the Commission and Sheriff offer for exempting the Fifth Agreement from R.C. 5105.41(D)(1)'s certification requirement. Because Toledo's director of finance did not attach an R.C. 5105.41(D)(1) certificate to the Fifth Agreement, that agreement is invalid and nonbinding as to Toledo.

{¶ 62} As a final matter, we must address the Sheriff's argument that the trial court erred in its interpretation of the interplay between Sections 6 and 8 of the Fourth Agreement. After reviewing the trial court's judgment, we conclude that the trial court engaged in no such interpretation. The trial court merely concluded that Sections 6 and 8 of the Fourth Agreement bound Toledo. Thus, the trial court did not err as the Sheriff has alleged.

{¶ 63} Having concluded that the Fifth Agreement does not bind Toledo, we find no error in the trial court's declaration. Accordingly, we overrule the Commission's first assignment of error and the remainder of the Sheriff's assignment of error.

{¶ 64} By the Commission's second assignment of error, it argues that the trial court erred in determining that the Fifth Agreement was not binding because the parties did not unanimously consent to it. We have concluded that the Fifth Agreement does not bind Toledo for a separate, unrelated reason. The Commission's second assignment of error, therefore, is moot.

30.

{¶ 65} Finally, we turn to Toledo's cross-assignment of error, by which Toledo argues that the trial court erred in ruling that Toledo was not entitled to reimbursement of the payment it made to the Commission at the end of the second quarter of 2016. This cross-assignment of error is not properly before this court.

{¶ 66} Pursuant to App.R. 3(C):

(1) **Cross appeal required.** A person who intends to defend a judgment or order against an appeal by an appellant and who also seeks to change the judgment or order or, in the event the judgment or order may be reversed or modified, an interlocutory ruling merged into the judgment or order, shall file a notice of cross appeal within the time allowed by App.R. 4.

(2) **Cross appeal and cross-assignment of error not required.** A person who intends to defend a judgment or order appealed by an appellant on a ground other than that relied on by the trial court but who does not seek to change the judgment or order is not required to file a notice of cross appeal or to raise a cross-assignment of error.

{¶ 67} Here, by its cross-assignment of error, Toledo seeks to reverse the trial court's ruling that denied it reimbursement. Thus, App.R. 3(C)(1) required Toledo to file a notice of cross appeal. Toledo did not do that. Accordingly, we cannot consider Toledo's argument, and therefore, we dismiss the cross-assignment of error. *See Bennett v. Waidelich*, 6th Dist. No. F-04-023, 2005-Ohio-2489, ¶ 32 (refusing to consider an

appellee's argument seeking to reverse the trial court's judgment when the appellee failed to file a notice of cross appeal).

{¶ 68} For the foregoing reasons, we overrule the Commission's first assignment of error, and the Board's and Sheriff's assignments of error. Our ruling on the Commission's first assignment of error renders the Commission's second assignment of error moot, and consequently, we do not rule on it. We affirm the judgment of the Lucas County Court of Common Pleas. Pursuant to App.R. 24, it is ordered that appellants pay the costs of this appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

William A. Klatt, J.             _____
                                                                   JUDGE

Lisa L. Sadler, J.                     _____

Julia L. Dorrian, J.                   JUDGE
CONCUR.

_____
                                                                   JUDGE

Judges William A. Klatt, Lisa L. Sadler and Julia L. Dorrian, Tenth District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.